**In the Matter of the WELFARE OF the CHILD OF J.L.L. and J.M.G., Parents.**

Nos. A11–354, A11–355.

Court of Appeals of Minnesota.

June 27, 2011.

Brian J. Middendorf, Morrison County Attorney, Amber M. Krause, Assistant County Attorney, Little Falls, MN, for appellant Morrison County Social Services.

Joshua Strom, Randall Tietjen, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, MN, for appellant guardian ad litem.

Gregory A. Peters, Timothy M. Churchwell, Peters & Churchwell P.A., Long Prairie, MN, for respondent J.L.L.

Considered and decided by WRIGHT, Presiding Judge; SCHELLHAS, Judge; and WILLIS, Judge.*

**OPINION**

SCHELLHAS, Judge.

Appellants challenge the district court's orders allowing J.L.L. to withdraw her consent to voluntary termination of parental rights and denying a petition to terminate J.L.L.'s parental rights to K.L.L. Appellants argue that the district court erred by allowing J.L.L. to withdraw her consent and in concluding that (1) J.L.L. rebutted the statutory presumption of palpable unfitness, (2) the county failed to show that J.L.L. is a palpably unfit parent, and (3) it was in K.L.L.'s best interests not to terminate J.L.L.'s parental rights. We affirm.

**FACTS**

On April 30, 2010, J.L.L. gave birth to her fourth child, K.L.L., who is the subject of this appeal. Shortly after K.L.L.'s birth, appellant Morrison County Social Services (the county) filed an expedited petition for termination of J.L.L.'s parental rights to K.L.L. The predicate for the county's petition was the involuntary termination of J.L.L.'s parental rights to her first three children arising out of the county's initiation of a child-in-need-of-protection-or-services (CHIPS) proceeding regarding J.L.L.'s first three children. M.H. is the father of J.L.L.'s first three children.

In the CHIPS proceeding involving J.L.L.'s first three children, the county alleged that: during 2006 and 2007, while living with M.H., J.L.L. committed numerous criminal offenses; J.L.L. reportedly used methamphetamine while pregnant with her third child; and the child tested positive for methamphetamine at birth. In December 2008, J.L.L. discontinued visitation with her children and ceased all contact with the county. The county then filed a petition for termination of J.L.L.'s parental rights, alleging that J.L.L. was palpably unfit to participate in the parent-child relationship and that reasonable efforts had failed to correct the conditions leading to the children's out-of-home placement. At the trial in May 2009, J.L.L. did not contest the involuntary termination of her parental rights to her three children.

J.L.L. achieved sobriety in January 2009, before her parental rights to her first three children were terminated. In August 2009, she became pregnant with K.L.L. and completed chemical-dependency treatment. At that time, J.L.L. was in a relationship with J.M.G., who is the adju-

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

dicated father of K.L.L. J.M.G. has a history of drug use and domestic abuse of J.L.L. At the time of the trial in this case, J.M.G. was subject to an order for protection that prohibited contact with J.L.L., except by telephone or text for the purpose of discussing parenting issues.

While pregnant, J.L.L. regularly attended AA meetings and maintained her sobriety. J.L.L. also inquired with the county about available services that could aid her in maintaining custody of K.L.L. after the birth. She reported to the county about her voluntary participation in services, including prenatal parenting instruction and employment-seeking assistance.

On May 3, 2010, three days after K.L.L.'s birth, the county filed an expedited petition for termination of parental rights (TPR) of J.L.L. to K.L.L. At a hearing on May 4, the county asked the district court to place K.L.L. in emergency protective care and to relieve it of its duty to engage in reasonable efforts to reunify J.L.L. with K.L.L. The court granted the county's request for emergency protective care of K.L.L. but ordered the county to provide J.L.L. with reunification services if she requested them. In June 2010, at a pretrial hearing, J.L.L. requested reunification services, including visitation. Based on J.L.L.'s history, the county and appellant guardian ad litem (GAL) objected to visitation. But the district court ordered supervised visitation and subsequently directed the county to file an out-of-home placement plan by July 2, 2010.[1]

After the pretrial hearing, licensed therapist Janet Brutger conducted an "in-home" evaluation of J.L.L. in a supervised visitation setting at the county's request. In August 2010, Brutger submitted her assessment to the county, concluding that J.L.L. was able to consistently provide K.L.L. with the care, safety, and nurturance in her home that K.L.L. needs, and Brutger recommended that J.L.L. spend unsupervised time with K.L.L. Also, in August, the district court reiterated that the county was not relieved of engaging in reasonable reunification efforts, noting that the social-services records, the parenting assessment, and the in-home evaluation suggested that J.L.L. had made substantial progress in her parenting skills since the filing of the TPR petition.

The TPR trial commenced September 16, 2010. On the second day of trial, J.L.L. consented to a voluntary TPR. She answered questions under oath concerning the affidavit she would submit to the district court giving her consent to voluntary termination, her state of mind, and the voluntariness of her consent. The district court did not make any oral findings or order a TPR from the bench. At the conclusion of the hearing, the county attorney offered to draft an order terminating J.L.L.'s parental rights, and the district court accepted this offer.

On September 21, J.L.L. sent a letter to the presiding district court judge, informing him that she felt "pressured" and "pushed" into giving her consent and asked that the court "place me with CHIPS." On September 23, before the district court signed or filed a written TPR order, J.L.L. filed the following notarized revocation of consent, dated September 22, revoking her consent: "I [J.L.L.] revoke my consent to adopt and affidavit of mother to voluntarily terminate parental rights that I signed on 9/17/10. I didn't understand what I signed. Immediately revoke this please."

On October 14, the district court issued an order and memorandum permitting

---

1. The county had not yet filed an out-of-home placement plan in February 2011, when the district court issued its order denying the county's TPR petition.

J.L.L. to withdraw her consent and resuming the TPR trial. The county objected to the court's order and, in response to the county's request, the court stayed the order and held an evidentiary hearing on November 4. Following the evidentiary hearing, the court reaffirmed its order permitting J.L.L. to withdraw her consent.

The TPR trial resumed on January 20, 2011. To rebut the presumption of palpable unfitness arising out of the involuntary termination of her first three children, J.L.L. offered testimony from the following witnesses: Brutger, the licensed therapist selected by the county to evaluate J.L.L.; Judith Blasczyk, a family counselor who supervised visitation between J.L.L. and K.L.L.; Jan Weidenbach, a group facilitator of parenting classes; Sabrina Hanson–Reiter, a therapist who provided individual therapy to J.L.L.; and Kendra Mooney, the director of the local Minnesota Workforce Center. At the conclusion of testimony from these witnesses, the district court ruled from the bench that J.L.L. had rebutted the presumption of palpable unfitness by affirmatively and actively demonstrating her ability to successfully parent K.L.L. in the reasonably foreseeable future.

The district court then heard testimony in support of the county's petition. The county called the following witnesses to testify: Karen Hawks, a home visitor; Kris Schlichting, the child-protection case manager assigned to the case; Deena McMahon, a clinical social worker and family therapist who performed an attachment assessment on J.L.L.; and two GALs: Lori Hanson, who was involved in the child-protection proceeding involving J.L.L.'s first three children and, in the proceeding involving K.L.L., until September 2010; and Jennifer Andres, who replaced Hanson.

On February 3, the district court issued written findings of fact, conclusions of law, order and an incorporated memorandum. The court denied the county's petition to terminate J.L.L.'s parental rights to K.L.L., reiterating its conclusion that J.L.L. had rebutted the presumption of palpable unfitness, concluding that the county had failed to prove by clear-and-convincing evidence that J.L.L. is palpably unfit, and concluding that K.L.L.'s best interests are served if J.L.L.'s parental rights are not terminated.

The county and the GAL appeal from the district court's order of October 14, 2010, accepting J.L.L.'s withdrawal of consent to voluntary termination of parental rights, and the district court's findings of fact, conclusions of law, order and incorporated memorandum filed on February 3, 2011, denying the county's TPR petition.

## ISSUES

I. Did the district court err by allowing J.L.L. to withdraw her consent to voluntarily terminate her parental rights to K.L.L.?

II. Did the district court err in concluding that J.L.L. successfully rebutted the presumption that she is palpably unfit to parent K.L.L.?

III. Does the record support the district court's denial of the TPR petition?

## ANALYSIS

██ "[P]arental rights may be terminated only for grave and weighty reasons." *In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 709 (Minn.App.2004). A district court's decision in a termination proceeding must be based on evidence concerning the conditions that exist at the time. *In re Welfare of Child of T.D.*, 731 N.W.2d 548, 554 (Minn.App.2007). An appellate court "exercises great caution in termination proceedings, finding such ac-

tion proper only when the evidence clearly mandates such a result." *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn.1996). On appeal we examine the record to determine whether the district court applied the appropriate statutory criteria and made findings that are supported by substantial evidence and not clearly erroneous. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 249 (Minn.App.2003). A finding is clearly erroneous when "it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660–61 (Minn.2008) (quotation omitted). We give the district court's decision considerable deference, but "closely inquire into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn.2008).

## I. Withdrawal of Consent to Voluntary Termination of Parental Rights

██ The juvenile court may, upon petition, terminate all rights of a parent to a child with written consent of the parent who for good cause wishes to voluntarily terminate his or her parental rights. Minn.Stat. § 260C.301, subd. 1(a) (2010). In a voluntary termination proceeding, "the best interests of the child must be the paramount consideration." *Id.*, subd. 7 (2010). Upon petition and voluntary consent, the court must conduct a hearing and place the parent under oath for purposes of asking that the petition be granted and establishing good cause for termination and that it is in the child's best interests. Minn. R. Juv. Prot. P. 42.08, subd. 2(a), (b). During the hearing, the court must advise the parent of their right to representation by counsel, "determine whether the parent fully understands the consequences of termination," inquire about the voluntariness of the parent's consent, and "obtain a waiv-

er of the right to trial on the involuntary petition." *Id.*, subd. 2(c).

██ After a court issues an order terminating parental rights in a voluntary termination proceeding, the order may be vacated only upon a showing of fraud, duress, or undue influence. *In re Welfare of K.T.*, 327 N.W.2d 13, 17–18 (Minn.1982). After termination, a change of mind or circumstances is insufficient to vacate a termination order. *Id.* But a parent is not precluded from "revoking a voluntary consent to termination for any reason before the court has accepted the consent and ordered termination." *In re Welfare of A.M.P.*, 507 N.W.2d 616, 620 (Minn.App. 1993), *superseded by statute on other grounds, Heidbreder v. Carton,* 645 N.W.2d 355, 363–66 (Minn.2002).

In arguing that the district court ordered termination on September 17, 2010, prior to receiving J.L.L.'s revocation of consent, appellants assert that a voluntary TPR was effective at the end of the hearing because the requirements of Minn.Stat. § 260C.301, subd. 1(a), and Minn. R. Juv. Prot. P. 42.08 were satisfied, and because at the end of the hearing, the court stated that the county attorney would prepare a draft of the order. These arguments are unconvincing.

Minnesota Statutes section 260C.301, subdivision 1(a), provides that a "court *may* upon petition, terminate all rights of a parent to a child" with consent of the parent "who for *good cause* " seeks to relinquish their parental rights. (Emphasis added.) *See* Minn.Stat. § 645.44, subd. 15 (2010) (stating that " '[m]ay' is permissive"). Rule 42.08, subdivision 2, identifies the procedure: a parent must be "placed under oath for the purpose of ... establishing that there is good cause [and termination] is in the best interests of the child." J.L.L.'s statements made under

oath satisfy these procedural requirements but do not discharge the court from its obligation to use the petition and testimony in making findings on whether good cause for termination exists and whether termination is in the child's best interests. *See* Minn.Stat. § 260C.301, subd. 1(a) (providing that if parent seeks voluntary withdrawal, parent must do so for "good cause"); *Tanghe*, 672 N.W.2d at 625–26 (stating failure by district court to make findings on child's best interests is error that requires remand).

Appellants rely on an unpublished opinion issued by this court, *In re Welfare of Children of J.L.H.*, No. A05–1402, 2005 WL 3470525, *4 (Minn.App. Dec. 20, 2005), *review denied* (Minn. Mar. 7, 2006), to support their argument that the district court ordered a TPR before it received J.L.L.'s written revocation of consent. *Id.* In *J.L.H.*, this court concluded from the record the district court ordered termination orally from the bench before the parent requested to withdraw her consent. *Id.* (affirming district court's refusal to permit parent to withdraw consent). As an unpublished opinion, *J.L.H.* is not binding authority. *See* Minn.Stat. § 480A.08, subd. 3(c) (2010) (stating that unpublished opinions of court of appeals are not precedent). Moreover, in this case, the district court concluded that "[J.L.L.] effectively withdrew her voluntary consent to termination of her parental rights." Based on the record, we agree with the district court's conclusion.

The trial transcript shows that the district court did not orally order a TPR from the bench on September 17, 2010. And the court neither addressed nor made any findings from the bench concerning good cause to accept J.L.L.'s consent to voluntarily terminate her parental rights or the best interests of K.L.L. *See In re Tanghe*, 672 N.W.2d 623, 625–26 (Minn.App.2003)

(holding that in termination proceedings, district court must consider child's best interests and explain rationale in findings and conclusions and that failure to do so is error requiring remand). The record shows that before the court received J.L.L.'s written revocation of consent, it did not issue an order terminating J.L.L.'s parental rights to K.L.L.

By written order, the district court allowed J.L.L. to withdraw her consent to a voluntary TPR. The court provided several reasons for permitting the withdrawal, including that it had not yet "granted the 'petition' signed by [J.L.L.]," it had not yet made findings on good cause or the best interests of the child, and that at the conclusion of the hearing, it had not issued an oral order terminating J.L.L.'s parental rights. Because we agree with the district court that it did not order termination of J.L.L.'s parental rights to K.L.L. before it received J.L.L.'s revocation of consent, we conclude that the court did not abuse its discretion in allowing J.L.L. to withdraw her consent to a voluntary TPR.

The GAL also argues that the district court erred on the basis that J.L.L. failed to establish undue influence. But a showing of undue influence is required only if a parent requests withdrawal of her consent after a district court orders termination. *A.M.P.*, 507 N.W.2d at 620. When, as in this case, a parent requests withdrawal of her consent before the court orders termination, the parent need not show undue influence. The district court did not abuse its discretion by permitting J.L.L. to withdraw her consent to voluntarily terminate her parental rights to K.L.L.

## II. Rebutting the Presumption of Palpable Unfitness

When a person's parental rights to one or more other children have been involuntarily terminated, a statutory pre-

sumption exists that the parent is palpably unfit. Minn.Stat. § 260C.301, subd. 1(b)(4) (2010). "Under these circumstances, the parent has the burden of rebutting the presumption of palpable unfitness." *D.L.R.D.*, 656 N.W.2d at 250. Because J.L.L.'s parental rights to her first three children were involuntarily terminated, she is presumed to be palpably unfit and bears the burden of rebutting that presumption. *See id.* The district court found that J.L.L. affirmatively and actively established her ability to successfully parent K.L.L., concluding therefore that J.L.L. rebutted the presumption of palpable unfitness.

The GAL first argues that in reaching its conclusion, the district court applied an improper standard of proof because the court conflated what J.L.L. needed to prove with the level of evidence by which she needed to prove it. The GAL asserts that J.L.L. was required to prove that she is fit by affirmatively and actively demonstrating her ability to successfully parent a child. We agree. *See D.L.R.D.*, 656 N.W.2d at 251. But the GAL further asserts that because the burden shifted to J.L.L., the district court should have required J.L.L. to prove her ability to successfully parent by clear-and-convincing evidence, the standard of proof by which the state must prove the existence of a statutory basis for TPR. We disagree. The GAL's assertion is not supported by the rules of evidence or caselaw.

Generally, the rules of evidence apply to juvenile-protection proceedings. Minn. R. Juv. Prot. P. 3.02, subd. 1. According to the rules of evidence, "a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift ... the burden of proof." Minn. R. Evid. 301. To rebut a presumption of unfitness, the par-

ent must "affirmatively and actively demonstrate her ... ability to successfully parent a child." *D.L.R.D.*, 656 N.W.2d at 251. In this context, the assumed fact is unfitness. *T.D.*, 731 N.W.2d at 554. "Although the burden of persuasion remains with the county, to rebut the presumption a parent must introduce sufficient evidence that would allow a factfinder to find parental *fitness.*" *Id.* (citing Minn. R. Evid. 301 1977 comm. cmt., which states that a presumption ceases to function if a party introduces evidence that supports a finding of fact contrary to assumed fact). Here, because the district court considered whether J.L.L. had introduced sufficient evidence to support a finding of parental fitness, we conclude that the court did not err.

Second, appellants challenge the sufficiency of the district court's finding that J.L.L. established the existence of conditions that show her fitness to parent K.L.L. The record shows that at the time of trial: J.L.L. had been sober since January 2009—for more than two years; J.L.L. attended AA meetings three times per week; J.L.L. was committed to avoiding unhealthy relationships that might adversely affect her sobriety or K.L.L.'s safety; J.L.L. had no intention of being in a relationship with M.H. or J.M.G.; J.L.L. had not had contact with M.H. since she gave birth to K.L.L.; J.L.L. used law enforcement to restrict contact with J.M.G.; J.L.L. complied with her probation and had been law abiding since May 2008; J.L.L. actively sought services from the county; J.L.L. participated in parenting classes; J.L.L. sought assistance in finding employment; J.L.L. had a stable living environment with her mother; J.L.L. participated in individual therapy; and J.L.L. sought and participated in supervised visitation with K.L.L.

In finding that J.L.L. demonstrated her fitness to parent K.L.L., the district court credited the testimony of Brutger, Blasczyk, Hawks, Weidenbach, and Hanson–Reiter. Based on its findings that Brutger and Blasczyk had more extensive and more recent opportunities to observe J.L.L. with K.L.L. and that the GALs' opinions were influenced by J.L.L.'s history concerning her first three children, the district court gave greater weight to the testimony of Brutger and Blasczyk than to the testimony of the GALs. We defer to the district court's determinations of witness credibility and the weight given to the evidence. *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn.1996).

Brutger observed J.L.L. with K.L.L. for six sessions that totaled 31 hours. She testified that J.L.L. ably performed basic parenting tasks, demonstrated an understanding of a child's developmental stages, and was able to problem solve in response to K.L.L.'s cues. Brutger opined that J.L.L. has the skills and determination to parent K.L.L. full time.

Blasczyk observed J.L.L. and K.L.L. on a weekly basis from August 2010 to January 2011 for a total of 54 hours. She testified that J.L.L. is very capable of parenting K.L.L. and meeting her needs, that she has no concerns for K.L.L.'s safety while K.L.L. is in J.L.L.'s care, that a bond exists between the two, and that she observed affection and gentleness during the visits. Blasczyk opined that J.L.L. is able to parent K.L.L. 24 hours a day and that, as part of the transition process, it is time to move to unsupervised visits.

Hawks, a witness for the county, worked with J.L.L. from February 2010, before K.L.L. was born, through September 2010. She testified that as of September 2010, J.L.L. demonstrated basic parenting skills. Weidenbach testified that over the previous year, J.L.L. received 358 hours of parenting instruction. During class, J.L.L. was very eager to learn, actively participated in the classes, and shared openly with others. Hanson–Reiter, who counseled J.L.L. on her co-dependency issues, testified that J.L.L. is motivated, genuine, committed to avoiding harmful relationships, and that her involvement in therapy is not a barrier to full-time parenting of K.L.L.

The district court's finding that J.L.L. affirmatively and actively demonstrated her ability to successfully parent K.L.L. is supported by substantial evidence in the record. The district court therefore did not err in concluding that J.L.L. rebutted the statutory presumption of palpable unfitness.

### III. Decision Not to Terminate Parental Rights

A district court may terminate a person's parental rights when it finds that the parent is "palpably unfit to be a party to the parent and child relationship." Minn.Stat. § 260C.301, subd. 1(b)(4). A parent is palpably unfit when clear-and-convincing evidence establishes a "consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship" and indicates that the conduct or conditions are of a "duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child." *Id.*

The district court concluded that the county had failed to demonstrate by clear-and-convincing evidence that J.L.L. is palpably unfit to participate in the parent and child relationship. In reaching its conclusion, the district court considered the conditions existing at the time of trial; that the only statutory basis for termination that the county alleged in the petition was

palpable unfitness; that the sole fact alleged in support of that basis was the termination of J.L.L.'s parental rights to her first three children in 2009; and that the county alleged no "new" facts. Although the county and GAL challenge the district court's conclusion, their arguments are unavailing because the court's conclusion is based on clear-and-convincing evidence in the record.

In a TPR proceeding, "the best interests of the child must be the paramount consideration." Minn.Stat. § 260C.301, subd. 7. The district court must consider the children's best interests and address those interests in its findings of fact and conclusions of law. *Tanghe*, 672 N.W.2d at 626. The court must balance the child's interests in preserving the parent and child relationship, the parent's interest in preserving the parent and child relationship, and any competing interests of the child. Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3); *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn.App.1992). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *R.T.B.*, 492 N.W.2d at 4. "[D]etermination of a child's best interests 'is generally not susceptible to an appellate court's global review of a record,' and ... 'an appellate court's combing through the record to determine best interests is inappropriate because it involves credibility determinations.'" *In re Welfare of Child of D.L.D.*, 771 N.W.2d 538, 546 (Minn.App.2009) (quoting *Tanghe*, 672 N.W.2d at 625).

The district court found that it is in K.L.L.'s best interests to be reunited with J.L.L. In making this finding, the court was "mindful" of the "presumption ... that it is ordinarily in the best interest[s] of a child to be in the custody of his [or her] natural parent." *In re Welfare of*

*Clausen*, 289 N.W.2d 153, 156 (Minn.1980). The court carefully considered K.L.L.'s and J.L.L.'s interests in preserving the parent-child relationship; the competing interests of K.L.L., which include a stable environment and her health and welfare; K.L.L.'s age, the circumstances of her present and proposed homes, and her attachment to and bonding with her biological mother and foster parents. K.L.L. is too young to express a preference. The record shows that J.L.L. is able to provide a stable living environment for K.L.L., to care for K.L.L.'s needs, and provide for K.L.L.'s welfare. The court noted that although K.L.L. has spent a small percentage of her life thus far with J.L.L., evidence establishes that bonding and affection exists between mother and child.

The county and GAL challenge the sufficiency of the district court's best-interests finding on the basis that it contradicts the testimony of McMahon and the GALs. Even if the record might support findings different from those made by the court, this does not show that the court's findings are defective. *Vangsness v. Vangsness*, 607 N.W.2d 468, 474 (Minn.App.2000). And, significantly, the court discredited some of McMahon's testimony and credited the testimony of other observers who had spent substantially more time with J.L.L. and K.L.L. than McMahon. The court also gave less weight to the GALs' testimony. We defer to the court's assessments on witness credibility. *L.A.F.*, 554 N.W.2d at 396. The district court's finding on K.L.L.'s best interests is supported by clear-and-convincing evidence in the record.

## DECISION

Because the district court did not abuse its discretion by allowing J.L.L. to with-

draw her consent to voluntarily terminate her parental rights, and because the district court properly concluded that J.L.L. rebutted the presumption of palpable unfitness and that the county failed to establish by clear-and-convincing evidence that J.L.L. is palpably unfit to parent K.L.L., we affirm.

**Affirmed.**